1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ANNETTE GUZMAN,                )   NO. CV 11-04196 SS
                                  )
12              Plaintiff,        )
                                  )
13        v.                      )
                                  )   **MEMORANDUM DECISION AND ORDER**
14  MICHAEL J. ASTRUE,            )
    Commissioner of the Social    )
15  Security Administration,      )
                                  )
16              Defendant.        )
    _____)

17

18                           **I.**

19                      **INTRODUCTION**

20

21       Annette Guzman ("Plaintiff") brings this action seeking to overturn

22  the decision of the Commissioner of the Social Security Administration

23  (hereinafter the "Commissioner" or the "Agency") denying her

24  applications for Social Security Income benefits ("SSI") and Disability

25  Insurance Benefits ("DIB").   On May 26, 2011, Plaintiff filed a

26  complaint (the "Complaint") commencing the instant action.   On October

27  3, 2011, the Commissioner filed an Answer to the Complaint (the

28  "Answer") and a certified administrative record ("AR").   Plaintiff and

the Commissioner each filed a memorandum of points and authorities ("Plaintiff's Memo." and "Commissioner's Memo.") in support of their positions on November 2, 2011 and December 5, 2011 respectively.   On December 20, 2011, Plaintiff filed a Reply to the Commissioner's Memorandum.   The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.   For the reasons stated below, the decision of the Agency is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff applied for SSI on January 28, 2008 and DIB on January 29, 2008, alleging a disability onset date of January 1, 2007.   (AR 142-53).   The Agency denied Plaintiff's initial application for SSI and DIB on May 9, 2008, (AR 106-110), and denied reconsideration on September 26, 2008.   (AR 113-17).   Plaintiff then requested a hearing, (AR 10-11), which was held on November 4, 2009 before an Administrative Law Judge ("ALJ"), (AR 27-64), where Plaintiff appeared with counsel and testified.   (AR 35-56).   On December 21, 2009, the ALJ denied benefits.   (AR 12-23).   The Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 16, 2011, (AR 1-5), making the ALJ's decision the final decision of the Agency.   Plaintiff then filed the instant action.

\\

\\

\\

\\

\\

2

### III.

### FACTUAL BACKGROUND

Plaintiff was 47 years old at the time of her alleged disability onset date.  (AR 116).  She can speak, understand, and write in English.  (AR 171).   Plaintiff's claimed disability stems from "diabetes, neuropathy, arthritis, hypertension, high cholesterol, back problems, pain on knees."  (AR 172).  Plaintiff's past occupations have included cashier, flower deliverer, interpreter and nurse assistant.  (AR 173).  Plaintiff worked as an interpreter for AT&T, which included serving as a night supervisor.  She also worked as an interpreter in customer service for Great Western Bank.  (AR 40-43, 44, 45, 57).  She has additional work experience as a caregiver for the elderly.  (AR 45).

**A.   Plaintiff's Medical History**

The majority of Plaintiff's medical records derive from visits to Dr. Santos Ricardo Carranza at Kaiser Permanente between December 2006 and May 2009.  (AR 218-323, 336-484).  Plaintiff was diagnosed with diabetes mellitus and high blood pressure more than ten years ago, although both conditions are controlled with medication.  (AR 324).  Plaintiff also has a history of obesity, leg and back problems.  (Id.)

On December 15, 2006, Dr. Matthew Marks Schniedermann examined Plaintiff and observed: "Depression mostly ok off rx (advised to return to psych if needed)."  (AR 315).  He further observed that her medical problems are "stable on medical management."  (AR 316).

3

On October 11, 2007, it was noted that Plaintiff had diabetes that was uncontrolled with complication.  (AR 291).  Dr. Carranza adjusted Plaintiff's medication for her diabetes and advised her that she may need insulin and that she needs to exercise regularly and lose weight. (Id.).  Dr. Carranza prescribed Cozaar for her hypertension.  (Id.).

On November 12, 2007, it was noted that Plaintiff's diabetes was uncontrolled with complication.  (AR 278).  Dr. Carranza recommended that Plaintiff continue her "current regimen" and he would see her in one month.  (Id.)

On December 12, 2007, it was noted that Plaintiff had "malaise and fatigue," diabetes that was uncontrolled with complication and that she was a smoker.  (AR 258).  For her diabetes, Dr. Carranza recommended that her medication be decreased and "if sugars still low then [decrease] due to hypoglycemia. . . will cont monitor for now."  (Id.)

On January 7, 2008, it was noted that Plaintiff's diabetes was "likely better controlled with recent change in diet" and her malaise and fatigue were "resolving."  (AR 236).  As for her smoking, the doctor noted: "continue to decrease amount.  adviced  (sic) that eventually needs to completely quit.  previously prescribed welbutrin but did not take." (AR 236).  The doctor observed that Plaintiff "overall feels better" and that Plaintiff agreed to decrease her tobacco use.  (AR 368).

On March 12, 2008, the records reflect observations regarding constipation, obesity, diabetic microalbuminuria, cellulitis and that

4

1   Plaintiff was a smoker.  (AR 354-56).  It was also noted that
2   Plaintiff's diabetes was controlled, and that she should continue her
3   current medication regimen.  (AR 355).  The doctor observed that
4   Plaintiff lost a "significant" amount of weight through diet and
5   exercise and had "better mobility."  (AR 354).  The doctor encouraged
6   Plaintiff to continue her current "weight loss/exercise/lifestyle
7   changes."  (AR 355).  Plaintiff's hypertension was also noted as being
8   controlled.  (Id.).

9

10  On November 21, 2008, it was noted that Plaintiff had controlled
11  diabetes, essential hypertension, shoulder region pain and low back
12  pain.  (AR 391).  With respect to Plaintiff's essential hypertension,
13  Dr. Carranza increased her medication Cozaar.  (Id.).  For her shoulder
14  and back pain, Plaintiff was prescribed Naproxen.  (AR 391).

15

16  On December 26, 2008, Dr. Carranza noted that Plaintiff was gaining
17  weight and eating more.  (AR 420).  Plaintiff reported that she was
18  "aware that this is really bad for her diabetes."  (Id.)  Dr. Carranza
19  increased her diabetes medication and emphasized that Plaintiff needed
20  to concentrate on losing weight.  (Id.).

21

22  On January 5, 2009, Plaintiff was diagnosed with impingement
23  syndrome of the shoulder.  (AR 408).  She was given a shoulder cortisone
24  injection, "which helped."  (AR 412).

25

26  On January 6, 2009, Plaintiff presented with back pain.  (AR 411).
27  Plaintiff reported that her blood pressure had been high, she had "not
28  really [been] following [her] diet as [she] should," and that her

5

"sugars are better than before with addition of glyburide." (AR 412).
Dr. Carranza ordered an MRI of her lumbar spine for her low back pain.
(AR 413). He further noted that her diabetes was controlled. (Id.).

On March 3, 2009, Plaintiff underwent an MRI of her lumbar spine
without contrast. (AR 387-88). As to Plaintiff's L4-5, the MRI
revealed a:

> 3 mm degenerative anterior spondylolisthesis of L4 with
> respect to L5. There is bilateral facet arthropathy and
> bilateral synovial cysts. The left-sided synovial cyst
> measures 7.3 mm and extends into the left lateral recess
> impinging the left L5 nerve root. The right-sided synovial
> cyst extends into the right postcrolateral canal without
> obvious lateral recess stenosis, measuring 7.7 mm. The
> combination of findings of the anterolisthesis, facet
> arthropathy, and synovial cyst results in overall moderately
> severe canal stenosis. The neural foramina are patent.

(AR 388).

On March 26, 2009, Dr. Carranza noted that Plaintiff's MRI revealed
spinal stenosis. (AR 456). He also observed that Plaintiff "had
appointment with pmr. Did not follow up." (Id.). Plaintiff's physical
examination revealed mostly normal findings. (AR 456). Plaintiff's
musculoskeletal exam reveal no edema. (Id.). The doctor also noted
that Plaintiff's diabetes was controlled and for her hypertension, he

prescribed Cozaar and Lisinopril.  (AR 457).  The doctor again counseled Plaintiff to stop smoking.  (AR 456).

On May 7, 2009, Plaintiff presented with chronic low back pain. (AR 452).  The physical examination notes state "Patient in no acute distress.  Heavyset.  Lumbar spine:  Inspection shows no misalignment/ asymmetry.  There is no spine tenderness to palpation in the spine. Range of motion is limited with pain by 20% flexion extension bilateral lateral bending.  Assessment of stability: normal.  Straight leg raise is negative bilaterally.  Patrick's is negative with painless passive hip range of motion."  (AR 453).  Plaintiff's gait was intact and she was able to walk on her toes and heels.  (Id.).  For her back pain, Plaintiff was given "5 trigger point injections" and was encouraged to lose weight and do water exercise.  (Id.).

**B.    State Agency Physicians' Opinions**

On May 8, 2008, after reviewing Plaintiff's medical file, state agency physician Dr. Cornelius C. Scott assessed Plaintiff as being able to lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for at least two hours, sit about six hours, unlimited push and/or pull abilities, occasional climbing, balancing, stooping, kneeling, crouching and crawling but no climbing on ladders, ropes or scaffolds.  (AR 331-32).  Plaintiff has no manipulative, visual, communicative or environmental limitations.  (AR 332-33).

On September 26, 2008, after reviewing Plaintiff's medical file, state agency physician Dr. C. Friedman determined that other than there

being an improvement in Plaintiff's sitting, "there is not significant change and affirm the ALJ [prior] decision."[1]   (AR 381).

C.   **Examining Consultative Examiners' Opinions**

On April 23, 2008, Dr. Jagvinder Singh, who is Board Certified in Internal Medicine, performed an Internal Medicine Consultation.   (AR 324-29).   Plaintiff's chief complaints were diabetes mellitus, high blood pressure, high cholesterol, leg and weight problems.   (AR 324). Plaintiff reported that has no problems with dressing, grooming and bathing herself.   (Id.).   She is able to cook, do dishes and laundry but also asserts that she cannot do much "due to shortness of breath." (Id.).

After a physical, musculoskeletal, range of motion, neurological and cranial nerves examination, Dr. Singh diagnosed Plaintiff with morbid obesity, bilateral knee osteoarthritis, diabetes mellitus with peripheral neuropathy, and hypertension, well controlled with medication.   (AR 325-28).   He thereafter opined that Plaintiff is able to stand and walk for two hours with breaks, sit without restriction, should use a single point cane for prolonged walking and standing, able to lift and carry 20 pounds occasionally and 10 pounds frequently.   (AR

---

[1]   On November 17, 2007, Plaintiff's prior application for DIB and SSI was denied.   (AR 89-97).   The ALJ determined that Plaintiff had the residual functional capacity to "perform sedentary exertional level work with avoidance of prolonged standing and walking, sitting for no more than 20-30 minutes at a time, no more than two hours of sitting in an eight-hour workday, occasional stooping, kneeling, and crawling, and no repetitive squatting, kneeling, stooping or climbing of stairs and ladders."   (AR 93).

328).   Plaintiff will have difficulty with crawling, kneeling and bending.   (Id.)   Finally, she has no manipulative and environmental restrictions.   (Id.).

On December 7, 2009, Dr. John Simmonds, an Orthopedic Surgeon, performed an orthopedic examination.   (AR 501-05).   He diagnosed Plaintiff with "discogenic disease of the lumbosacral spine status post microdiscectomy currently with multilevel degenerative disc disease with stable anterolisthesis of L4-L5," "myofascial muscular pain of the lower back" and "posttraumatic arthritic changes of the right knee."   (AR 504).   Based on the examination, clinical history and objective findings, he opined that Plaintiff could lift and carry approximately 50 pounds occasionally and 25 pounds frequently, stand and walk four hours in an eight-hour work day and does not require the use of an assistive ambulatory device.   (AR 505).   Plaintiff has no sitting limitations and postural limitations such as bending, kneeling, stooping, crawling and crouching can be performed on a frequent basis. (Id.).   Plaintiff can perform overhead activities and has full use of her hands for fine and gross manipulative movements.   (Id.).

D.   **Plaintiff's Testimony**

Plaintiff testified that she did not work in 2007 because she could not stand and sit for long periods of time.   (AR 37).   She can stand and sit for about 20 minutes each.   (Id.).

Plaintiff's previous occupations have included being a nurse assistant, interpreter, taking care of the elderly and delivering

9

flowers.   (AR 40-46).   She stated that she could no longer deliver flowers because her back hurt and her legs did not support her.   (AR 46).   She is also unable to work as an interpreter because she "can't sit that long, for six hours or four hours or three hours or two hours." (Id.).

Plaintiff testified that she is unable to work because of her diabetes.   (AR 47).   Her diabetes "usually goes up and down, it flexes every time" and if she does not control her diabetes, she has to "go into dialysis."   (Id.).   She takes medication for her diabetes, but has not been prescribed insulin.   (AR 47-48).   She also takes medication for her high blood pressure.   (AR 48).

Plaintiff further testified that she is unable to work because of the pain in her back, legs and arms.   (AR 47).   She takes Vicodin and Motrin for her back pain.   (Id.).

Plaintiff testified that she lives alone, does not drive but takes the bus.   (AR 49-50).   In response to the ALJ's question regarding how she spends her days, Plaintiff replied:

> I get up in the morning.  I have breakfast.  I take my
> pills.  I usually try to make my bed.  I go outside and water
> my plants.  I have like five plants that I have to water.  I
> go back inside.  I lay down for a while.  I try to figure out

1    what I want to make for dinner and lunch.  I get in to have

2    a shower.  And that's about it.

3

4  (AR 50).

5

6     Plaintiff also watches a little television.  (Id.)  She goes

7  shopping when she gets her food stamps, but she has a friend go with

8  her.  (Id.).  She is "semi" able to keep her house straight but she has

9  friends that help her clean while she makes them dinner.  (AR 51-52).

10 She tries to go to the park with her friends where she will either just

11 sit or have a barbeque.  (Id.).  Plaintiff confirmed that all she does

12 all day is "just watch[] a little TV and lay[] down."  (AR 52).

13

14     Plaintiff is 5'4" and weighs 240 pounds.  (AR 53).  She used to

15 weight 370 pounds but two years ago due to a "cut on [her] leg," she

16 started to lose a lot of weight and within six months she lost close to

17 100 pounds.  (Id.).  Her knees are very weak and her shoulders hurt.

18 (AR 54).  She had a cortisone shot in her shoulder which helped.  (AR

19 54-55).  Her pain level during the day is "an eight to nine" on a scale

20 of ten.  (AR 55).  She takes Vicodin for her pain but that only helps

21 "for like three or four hours and then I take Tylenol Arthritis.  I just

22 take Motrin, Motrin 800 milligrams and sometimes I take them twice [or

23 three times] a day."  (Id.).

24 \\

25 \\

26 \\

27 \\

28 \\

11

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 416.920. The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part

---

[2]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. § 416.910.

1    404, Subpart P, Appendix 1?  If so, the claimant is
2    found disabled.  If not, proceed to step four.

3    (4)  Is the claimant capable of performing h[er] past work?
4         If so, the claimant is found not disabled.  If not,
5         proceed to step five.

6    (5)  Is the claimant able to do any other work?  If not, the
7         claimant is found disabled.  If so, the claimant is
8         found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience.  Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

13

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled. (AR 15-23). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2007. (AR 17). At step two, the ALJ found that Plaintiff had severe impairments of diabetes mellitus type II with associated neuropathy, hypertension, multi-level degenerative disc disease of the back, and knee pain status post right medial meniscectomy. (Id.).

At step three, the ALJ determined that Plaintiff did not have an impairment that meets or equals a listed impairment. (AR 18). At step four, the ALJ found that Plaintiff could perform light work, and was able to "occasionally lift and carry 20 pounds and frequently 10 pounds, would be able to stand and walk 2 hours in an 8-hour workday, but not continuously, no limitations with sitting; would be able to occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but would be precluded from climbing ladders, ropes and scaffolds." (Id.).

At step five, the ALJ relied on a vocational expert's ("VE") testimony. (AR 22-23). The VE testified that Plaintiff had the past relevant work as a deliverer which was an "unskilled job generally performed at medium level and actually performed at light level;" interpreter, which was a "skilled job generally performed and actually performed by [Plaintiff] at sedentary level" and nurse assistant which was a "semi-skilled job generally performed and actually performed at

14

medium level." (AR 23). In comparing Plaintiff's residual functional capacity ("RFC") with the physical and mental demands of her past relevant work, the ALJ then determined that Plaintiff could perform her past relevant work as an interpreter as actually and generally performed at the sedentary level but "would not be able to perform her past relevant work as a deliverer or a nurse assistant because the physical demands of these jobs exceeded the [Plaintiff's RFC]." (AR 22). Accordingly, the ALJ found that Plaintiff could return to her past relevant work as an interpreter and was not disabled. (Id.).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can

15

1  reasonably support either affirming or reversing that conclusion, the
2  court may not substitute its judgment for that of the Commissioner.
3  <u>Reddick</u>, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

**A.**  **The ALJ Gave Clear And Convincing Reasons In Rejecting Plaintiff's**
    **Pain Testimony**

    Plaintiff contends that the ALJ failed to articulate clear and
convincing reasons for rejecting her pain testimony. (Plaintiff's Memo.
at 3-9).  Specifically, Plaintiff complains that, contrary to the ALJ's
conclusion, the objective medical evidence did support her subjective
complaints as to her back pain, diabetes and hypertension. (<u>Id.</u> at 4-6,
8).  Plaintiff also contends that the ALJ's conclusion that her
treatments have been routine and conservative is based on the ALJ's own
speculation.  (<u>Id.</u> at 6).  Lastly, she complains that the ALJ
inaccurately described her daily activities. (<u>Id.</u> at 7-8).  The Court
disagrees.

    Whenever an ALJ's disbelief of a claimant's testimony is a critical
factor in a decision to deny benefits, as it is here, the ALJ must make
explicit credibility findings. <u>Rashad v. Sullivan</u>, 903 F.2d 1229, 1231
(9th Cir. 1990).  Unless there is affirmative evidence showing that a
claimant is malingering, the ALJ's reasons for rejecting the claimant's
testimony must be "clear and convincing." <u>Parra v. Astrue</u>, 481 F.3d
742, 750 (9th Cir. 2007); <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir.

16

1995).  As long as Plaintiff offers evidence of a medical impairment
that could reasonably be expected to produce pain, the ALJ may not
require the degree of pain to be corroborated by objective medical
evidence.  Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991) (en
banc); Smolen, 80 F.3d at 1282.

The ALJ may, however, reject Plaintiff's testimony regarding the
severity of her symptoms if he points to clear and convincing reasons
for doing so.  See Smolen, 80 F.3d at 1283-84.  To determine whether
Plaintiff's testimony regarding the severity of her symptoms is
credible, the ALJ may consider, among other things, the following
evidence:  (1) ordinary techniques of credibility evaluation, such as
the claimant's reputation for lying, prior inconsistent statements
concerning the symptoms, and other testimony by the claimant that
appears less than candid; (2) unexplained or inadequately explained
failure to seek treatment or to follow a prescribed course of treatment;
and (3) the claimant's daily activities.  Id. at 1284.  If the ALJ's
credibility finding is supported by substantial evidence in the record,
the court may not engage in second-guessing.  Thomas v. Barnhart, 278
F.3d 947, 959 (9th Cir. 2002).

The ALJ determined that Plaintiff is credible "to the extent she
would experience some low back and knee pain due to her degenerative
anterior spondylolisthesis, and medial meniscus tear in her right knee
with heavy lifting or prolonged periods of walking and/or standing," and
therefore reduced Plaintiff's RFC to accommodate those limitations.  (AR
21).  However, the ALJ did not find Plaintiff's allegations that "she

17

is incapable of all work activity to be credible because of significant inconsistences in the record as a whole." (AR 22).

Here, the ALJ gave clear and convincing reasons for discounting Plaintiff's allegations of subjectively disabling symptoms. (AR 19-22). Specifically, the ALJ found that the medical evidence, conservative treatment and Plaintiff's daily activities fail to support the alleged severity of Plaintiff's symptoms and that Plaintiff retains the "ability despite her impairments to perform work activities with the limitations set forth above." (AR 22).

### 1.   Objective Medical Evidence And Conservative Treatment

####    a.   Diabetes And Hypertension

First, the ALJ found that the objective evidence is inconsistent with Plaintiff's alleged disabling symptoms of her diabetes and hypertension. (AR 20). The ALJ noted that contrary to Plaintiff's contention that her diabetes and hypertension were uncontrolled, the medical evidence indicated otherwise. (Id.).

Although there is evidence in Plaintiff's earlier treatment notes that her diabetes was "uncontrolled, with complication," her most recent office visits suggest that her diabetes was well-controlled with medication. (See AR 457 - March 26, 2009, AR 413 - January 6, 2009, AR 391 - November 21, 2008, AR 355 - March 12, 2008). Further, the record supports the ALJ's conclusion that Plaintiff's diabetes improved with diet and exercise. (AR 20, 236, 354, 420); see Warre v. Comm'r of Soc.

18

Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). The record also indicates that Plaintiff was not following the recommended advice of her doctors to diet and exercise to better control her diabetes. For instance, on December 26, 2008, Plaintiff reported that she was gaining weight and eating more and that she was "aware that this is really bad for her diabetes," and Dr. Carranza emphasized that Plaintiff needed to concentrate on losing weight to control her diabetes. (AR 20). Yet, on January 9, 2009, Plaintiff reported that she was "not really following diet as should" (AR 412) and on March 26, 2009, it was noted that Plaintiff was not exercising. (AR 456). Earlier, however, when Plaintiff was following her doctors' advice, she lost a "significant amount of weight" through diet and exercise. (AR 354).

Similarly, there is no evidence that Plaintiff's hypertension was uncontrolled. Plaintiff's treatment notes indicate that her hypertension was either well-controlled or controlled through adjustments of her medication, Cozaar. (AR 20, 292, 303, 355, 391, 413, 421, 446, 457).

The ALJ also cited conservative treatment for Plaintiff's diabetes and hypertension to reject her testimony. (AR 20); see also Parra, 481 F.3d at 751 (holding that "conservative treatment" is sufficient to discount a claimant's testimony regarding the severity of an impairment). Plaintiff was prescribed medication for her diabetes and hypertension, however, it does not appear that she received any more

19

1  extreme treatment or great increases in her medication over time.[3]  (AR
2  236, 244, 258, 278, 292-93, 303, 355, 391, 413, 420-21, 446, 457).  For
3  example, the ALJ noted that Plaintiff was not prescribed insulin for her
4  diabetes.  (AR 20).  Further, Plaintiff's medication use for her
5  diabetes and hypertension suggested to the ALJ that her medications have
6  been effective in controlling her diabetes and hypertension.  (Id.).
7  The consistent use of specific medications also suggests that Plaintiff
8  did not suffer from debilitating side effects from the medications.
9  Lastly, as discussed above, the medical records show that Plaintiff's
10 doctors recommended that she diet and exercise because it "contributed
11 to a better control of her diabetes."  (AR 20, 236, 354, 420); Warre,
12 439 F.3d at 1006.  Thus, the ALJ properly found that Plaintiff's
13 conservative treatment and improvement with medication were convincing
14 reasons to reject her testimony.

15
16        b.  Chronic Low Back Pain
17
18      The ALJ noted that Plaintiff was credible to the extent she would
19 experience some low back pain, and her RFC was reduced to accommodate
20 that limitation.  (AR 21).  However, the ALJ did not find Plaintiff's
21 complaints credible to the extent Plaintiff was incapable of all work
22 activity because it was inconsistent with the objective medical
23 evidence, particularly a March 3, 2009 MRI that revealed a "slight facet
24 hypertrophy, but no evidence of canal or foraminal stenosis."  (AR 20).
25 Plaintiff correctly notes that the ALJ "misread the MRI" and that the
26 MRI does in fact reveal "severe canal stenosis."  (Plaintiff's Memo. at
27 _____
28      [3]  Plaintiff reported that she was diagnosed with diabetes mellitus
   and hypertension more than ten years ago.  (AR 324).

20

5).  However, the Court concludes that even if the ALJ erred in her precise reading of the MRI record, any error was harmless, because the remaining medical records overwhelmingly support the ALJ's conclusions.

In his orthopedic examination of Plaintiff, Dr. Simmonds specifically noted that he reviewed the March 3, 2009 MRI.  (AR 501).  He noted that the MRI revealed "overall moderate severe canal stenosis." (Id.).  Based on this evidence, as well his review of Plaintiff's medical history and his examination of Plaintiff, Dr. Simmonds assessed Plaintiff with a less restrictive RFC than the one imposed by the ALJ. Dr. ."Simmonds opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently and could stand and walk for four hours.  (AR 505).  Dr. Simmonds assessed no sitting limitations and postural limitations such as bending, kneeling, stooping, crawling and crouching could be done frequently.  (Id.).  Under these circumstances, even assuming the ALJ fully credited the MRI findings, it is unlikely that she would have given Plaintiff a more restrictive RFC.  Moreover, the ALJ specifically incorporated appropriate limitations as to Plaintiff's back into her RFC findings.  Accordingly, any error in the ALJ's consideration of the MRI report was harmless.  (AR 21).  See Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions' and the error 'does not negate the validity of the ALJ's ultimate . . . conclusion,' such is deemed harmless and does not warrant reversal.") (quoting Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004)); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

1    The ALJ also cited conservative treatment to reject Plaintiff's
2    pain testimony regarding her back pain.  Parra, 481 F.3d at 751.
3    Specifically, the ALJ noted that Plaintiff's treatment for her back had
4    been "essentially routine and conservative in nature" and she had "not
5    undergone any invasive surgery or other treatment for her pain." (AR
6    20-21).  The medical records support the ALJ's conclusion.  Although
7    Plaintiff was prescribed Vicodin and Naproxen and on one occasion was
8    injected with lidocaine for her back pain, the medical records indicate
9    that she did not receive any more extreme treatment.  Instead, the
10   medical records show that her doctors used conservative care to manage
11   her pain, and recommended water exercise and weight loss.  (AR 391,
12   453).  There is evidence that Plaintiff's physician discussed the option
13   of surgery for her back but only if she developed lower limb symptoms
14   or if her low back pain did not improve.  (AR 453).  Thus, this could
15   reasonably suggest that Plaintiff's pain was not overly severe.
16   Carmickle, 533 F.3d at 1162.  The conservative care to manage
17   Plaintiff's back pain was supported by substantial evidence, and not
18   based on mere speculation as Plaintiff suggests.

19
20   **2.   Daily Activities**
21

22   The ALJ stated that Plaintiff's "high level of daily functioning
23   is not typical of someone in debilitating pain and is therefore
24   inconsistent with [Plaintiff's] subjective complaints." (AR 20).  To
25   support this finding, the ALJ cited Plaintiff's admission that her
26   activities of daily living included, "waking up, making her bed,
27   watering her plants, watching TV, grocery shopping, and cooking.  She
28   occasionally has to lie down and rest for awhile.  She sometimes visits

1  with her friends and goes to the park." (Id.).  Plaintiff contends that

2  the ALJ did not accurately describe her daily activities. (Plaintiff's

3  Memo. at 6-7).

4

5       After reviewing the record, the Court finds that the ALJ's

6  paraphrasing of Plaintiff's testimony regarding her daily activities is

7  generally accurate.

8

9       First, the ALJ noted that Plaintiff goes grocery shopping.  (AR

10  20).  However, Plaintiff alleges that she "relies on a friend to help

11  her go grocery shopping." (Plaintiff's Memo. at 7).  At the hearing,

12  Plaintiff testified that she goes shopping "when I get my food stamps,

13  but I have a friend come with me."  (AR 50).  Plaintiff's testimony

14  could reasonably be interpreted to suggest that Plaintiff has a friend

15  go with her grocery shopping and not necessarily that she relies on her

16  friend to go grocery shopping.  This Court must defer to the ALJ's

17  interpretation of the evidence when it is reasonably based upon the

18  record. Batson, 359 F.3d at 1193.  Moreover, even if it is true that

19  Plaintiff relies on a friend to shop, her remaining activities

20  demonstrate that she is capable of her past relevant work.

21

22       Plaintiff alleges that she is "unable to perform household chores,

23  and again relies on a friend in exchange for dinner." (Plaintiff's

24  Memo. at 7).  At the hearing, in response to the ALJ's question as to

25  whether she can keep her house straight, Plaintiff responded, "Semi; I

26  mean, it's not -- I have a friend that, that comes over and I make him,

27  I make them dinner and they help me clean my bathroom --" (AR 50).  This

28  could be reasonably interpreted as suggesting that Plaintiff is able to

23

do some of her household chores but receives help from her friends in exchange for dinner, not that she is unable to perform any household chores. Batson, 359 F.3d at 1193.

Next, the ALJ noted that Plaintiff "sometimes visits with her friends and goes to the park." (AR 20). However, Plaintiff alleges that she "attempts to go to the park, which indicates that she has some difficulty in that regard unlike the ALJ's summary of this particular activity." (Plaintiff's Memo. at 7). At the hearing, Plaintiff testified that she has friends and "I try to go the park [with them]." (AR 51). The ALJ asked Plaintiff what she does at the park, and she responded, "We just sit there, really. We don't do any -- like we usually get together with some friends and barbecue or something and I'm there a couple hours and then I -- take a chair for me." (AR 51-52). The Court finds that the ALJ's interpretation of Plaintiff's testimony was reasonable. Batson, 359 F.3d at 1193.

Moreover, Plaintiff's statements to Dr. Singh completely corroborate the ALJ's finding that Plaintiff engaged in significant daily activities that were inconsistent with her alleged pain. Plaintiff reported to Dr. Singh that she has "no problems with dressing grooming and bathing herself" and "she is able to do cooking, dishes and laundry but she cannot do much due to the shortness of breath." (AR 324).

Plaintiff cites Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998), for the proposition that a claimant should not be penalized for attempting to live a normal life and should not be required to "vegetate

24

1  in a dark room" in order to receive benefits. (Plaintiff's Memo. at 7).

2  While Plaintiff is correct with respect to her citation to the court's

3  observations in Reddick, the court also observed in that case that the

4  ALJ may consider in her credibility assessment whether "the level of

5  activity [is] inconsistent with Claimant's claimed limitations . . . ."

6  Id. (emphasis added). Here, the ALJ did follow Reddick, by considering

7  the extent of Plaintiff's daily activities and comparing this to

8  Plaintiff's testimony of totally debilitating pain.

9

10      Thus, the Court concludes the ALJ provided clear and convincing

11 reasons for rejecting Plaintiff's testimony regarding her claim of

12 complete disability.

13

14 **B.   <u>The ALJ Properly Evaluated Plaintiff's Mental Impairment</u>**

15

16      Plaintiff claims that the ALJ failed to properly evaluate her

17 mental impairment. (Plaintiff's Memo. at 9-11). The Court disagrees.

18

19      Where there is evidence of a mental impairment that allegedly

20 prevents the plaintiff from working, the Agency has supplemented the

21 five-step sequential evaluation process with additional regulations.[4]

22 Maier v. Comm'r of Soc. Sec. Admin., 154 F.3d 913, 914-15 (9th Cir.

23 1998) (citing 20 C.F.R. § 416.920a) (per curiam). When a plaintiff

24 raises a colorable claim of mental impairment, the ALJ must follow a

25

26      [4]   These additional steps are intended to assist the ALJ in
determining the severity of mental impairments at steps two and three.

27 The mental RFC assessment used at steps four and five of the evaluation
process, on the other hand, require a more detailed analysis. Social

28 Security Ruling ("SSR") 98-8p, 1996 WL 374184 at * 4.

"special technique" to evaluate the plaintiff's limitations.  20 C.F.R. § 416.920a (2006) ("[W]e must follow a special technique at each level in the administrative review process").   The ALJ must evaluate the plaintiff's claims and incorporate the pertinent findings and conclusions into her decision.  Id. ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).   The decision must include a specific finding as to the degree of limitation in each of the functional areas.").   If the claimant has a medically determinable impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" for the four broad functional areas: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation.   20 C.F.R. § 416.920a(b)(2), (c)(3).

An ALJ's failure to follow the required procedure mandates remand only if the claimant has a "colorable claim of a mental impairment." Cf. Gutierrez v. Apfel, 199 F.3d 1048, 1051 (9th Cir. 2002), superseded by regulation as stated in Selassie v. Barnhart, 203 Fed. App'x 174, 175 (9th Cir. 2006) (holding that, where there is a colorable claim of mental impairment, the ALJ must strictly follow regulations for evaluating mental impairment); see also Gunderson v. Astrue, 371 Fed. App'x 807, 808 n.1 (9th Cir. 2010) ("Although Gutierrez dealt with the prior version of section 404.1520a, the current version, although different, imposes similar obligations on the ALJ."); Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005) ("We thus join our sister circuits in holding that where a claimant has presented a colorable claim of

26

mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into [her] findings and conclusions."); but see Rabbers v. Comm'r of Social Sec. Admin., 582 F.3d 647, 658 (6th Cir. 2009) (finding the failure to strictly follow mental impairment regulations was harmless error).  A colorable claim is one which is not "wholly insubstantial, immaterial, or frivolous."  Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987).

Following the technique outlined in Section 416.920a(c) and (e), however, is only required for medically determinable impairments.  See 20 C.F.R. § 416.920a(b).  The claimant must prove the existence of a physical or mental medically determinable impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 404.908; see also Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005) (noting that the existence of a medically determinable physical or mental impairment may only be established with objective medical findings) (citing SSR 96-4p, 1996 WL 374187 at *1-2).  Symptoms are a claimant's own description of his or her impairment, and alone are not enough to establish a mental impairment.  Signs include observable psychological abnormalities and must be medically demonstrable phenomena and laboratory findings must be shown through medically acceptable laboratory techniques.  20 C.F.R. § 416.928.

Here, the record contains no evidence of "pertinent symptoms, signs, and laboratory findings" that Plaintiff suffered from depression within the relevant time period.  Although "Depression, Major, Recurrent, in Partial Remission" appears as part of Plaintiff's "Problem

List" in each office visit print out, the Court agrees with Respondent that this list is simply a log of problems Plaintiff has had in her medical history. (See 219, 226, 233, 246, 253, 258, 264, 266, 271, 274, 279, 283, 287, 299, 304, 313, 340, 426, 428). Other than these references and Plaintiff's own statement in her disability report that she was taking Amitriptyline for depression (AR 206), there is little evidence that Plaintiff suffered from or was treated for depression. Moreover, neither of these references demonstrates that Plaintiff had depression that "significantly limits [her] physical or mental ability to do basic work activities," 20 C.F.R. § 416.920(c), or that the depression lasted "a continuous period of at least 12 months." Id. § 416.909. Indeed, a progress note dated December 15, 2006 states "Depression mostly ok off rx (advised return to pscyh if needed)," and there is no evidence in the record that Plaintiff ever returned for needed or additional psychological or psychiatric assistance. (AR 315). The evidence fails to show a "colorable claim of a mental impairment."

The Court also notes that Plaintiff's applications for benefits fail to mention any symptoms related to a mental impairment, let alone that she suffered any mental impairment within the relevant time period other than the isolated reference that she was taking Amitriptyline. (See AR 106, 113, 172, 175-76, 192-95, 204-07). Also notable is the fact that at the hearing, neither Plaintiff nor her attorney, who had an opportunity to examine Plaintiff, mentioned that Plaintiff suffered from depression although the ALJ specifically asked what further impairments prevented Plaintiff from working and what prescribed medications she was taking. (AR 47-49, 52-56).

Under these circumstances, the Court finds that Plaintiff failed to meet her burden of proof on this issue.  <u>See</u> <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four . . . .").  In sum, because there is no colorable claim of a mental impairment, the ALJ was not required to consider that claim and was not required to follow the process outlined 416.920a(c) and (e) nor evaluate the severity of Plaintiff's mental limitations.

## VIII.

### CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[1] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner.  IT IS FURTHER ORDERED that the Clerk of

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

---

[1]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

29

the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED:  December 27, 2011

_____
/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

     **THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS IT INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**